TEUTSCH, Appellant, v. HVISTENDAHL, Respondent

(29 N. W.2d 389.)

(File No. 8921. Opinion filed Oct. 28, 1947.)
Rehearing Granted Dec. 12, 1947.

**Everett A. Bogue,** of Vermillion, for Appellant.
**Byron S. Payne,** of Pierre, for Respondent.

SMITH, J. The purchaser of real estate brought this action under SDC 37.06 to reform and specifically enforce his contract. Findings, conclusions and judgment favorable to the vendor resulted. The purchaser has appealed.

The vendor inherited Lots 7, 8 and 9, Block 3, Bigelow's University Addition to Vermillion, South Dakota. These

50-foot lots front to the south on a street, an alley extends along the east side of Lot 7, and an avenue extends along the west side of Lot 9. A dwelling house located principally on Lot 7 overlaps Lot 8 a distance of 6.7 feet. During the negotiations about to be described the vendor believed that the above-mentioned house was located on Lot 7. The vendor has lived in Mobridge, South Dakota, since before his mother first acquired these lots. The purchaser has lived in Vermillion for a period of years.

In January 1943, P. J. Ericson, a real estate broker of Vermillion, inquired by letter whether the vendor would put a price on the house. In answer the vendor wrote he wanted $3,500 for the "house and the lot it stands on", and further wrote, "Should you find someone interested, and they will make a reasonable offer, communicate with me * * *." The property was shown to the purchaser by Ericson in late 1944. In December 1944 Ericson wrote the vendor: "As you will see from the enclosed Contract for sale I have received an offer on Lot 7, Block 3 Bigelow's Addition. This is the lot with the house on it." The purchaser had made an offer of $3,000 and had signed the enclosed contract describing Lot 7. The vendor refused this offer and returned the contract. Thereafter, at the request of the purchaser, Ericson talked with the vendor by long distance and raised the offer to $3,500. In making the offer Ericson told the vendor he would have to protect him for a commission of $100. The vendor stated he would consider the offer and let him know. Thereafter, the vendor prepared and signed the contract we are considering and forwarded it to Ericson for execution by and delivery to the purchaser. The letter of transmittal reads in part: "Pursuant to our conversation had via phone today, I am encolsing herewith one copy of the contract for sale of my house there in Vermillion." This contract described Lot 7, and provided that the purchaser should pay the 1944 and subsequent taxes, and that he should receive the rents beginning March 1st, 1945.

A photograph of the house which had been taken during the growing season was received in evidence. It indicates

that the east half of Lots 7, 8 and 9 are filled to a slightly different level than the west half; that three trees form a somewhat irregular line about 15 feet west of the house, and that ·the grass east of these trees had had care. In his complaint the purchaser alleged that in showing the 'property Ericson had located the west line of Lot 7 as approximately 15 feet west of the house, and he so testified at the trial. However, he called Ericson as a witness, and he testified that although he actually thought the line of Lot 7 was 6 or 7 feet west of the house, the west boundary of the property was not discussed during his negotiations with the purchaser. The court found: "The Plaintiff Teutsch, in company with the said P. J. Ericson, visited and looked over the property involved before he made his deal to purchase same. From Plaintiff's inspection of the property he saw that approximately the east half of Lots 7, 8 and 9 had been filled and graded; and that some trees were about 15 feet west of the house, that he thought the west line of Lot 7 was at a place which was found to be about 22 feet west of the actual line of Lot 7. That no attempt was made to point out or determine the line between Lots 7 and 8."

The purchaser discovered that the house rested in part on Lot 8 in February 1945. He first notified Ericson. Thereafter, he wrote to the vendor as follows, "I had expected to hear from Mr. P. J. Erickson in regard to buying the East Half of lot 8 to go with Lot 7 as part of the house sets on the east half of lot 8, that would give me 75 feet and leave you 75 feet which is a nice size lot for a residence."

After some attempt to compromise their differences, the purchaser brought this action and alleged that Ericson, as the vendor's agent, had represented that the house stood on Lot 7, and that the west line of Lot 7 was approximately 15 feet west of the west side of the dwelling and "that through mutual mistake on the part of the plaintiff and defendant the description of the premises so sold by defendant to the plaintiff and purchased by the plaintiff from the defendant was erroneously set out as Lot 7 instead of Lot 7 and the east half of Lot 8 as it should have been." The answer of the vendor denied that he had agreed either orally or in

writing to sell the purchaser any property other than the property described in the said contract and offered a rescission of the contract.

The trial court found: "The only agreement upon which the minds of the Plaintiff and the Defendant met was the written contract, copy of which is attached to the Plaintiff's Complaint, whereby the Defendant agreed to sell to the Plaintiff the said Lot 7 for the sum of $3500.00. The minds of the parties did not meet on any other or different contract." The court refused to adopt a finding requested by the purchaser reading as follows: "That in the contract for sale of real estate between the parties to this action, a copy of which is hereto attached, the plaintiff intended to buy and the defendant intended to sell the dwelling house and ground upon which it stood, and that such property was through mutual mistake of the parties described as lot 7 instead of Lot 7 and the east 6.7 feet of Lot 8, Block 3, of Bigelow's University Addition as it should have been." The foregoing finding of the court and its refusal of the quoted request furnish the basis for the purchaser's principal contention on appeal.

Whether the purchaser has a remedy is not the question. His contention is that he has established his right to the equitable remedy of reformation.

By statute it is provided: "When through fraud or mutual mistake of the parties, or a mistake of one party which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value." SDC 37.0601.

██ The argument of the purchaser in this court is not predicated upon a claim that the phrasing of the written contract resulted from the fraud or other inequitable conduct of the vendor. To establish a right to the remedy for which the statute makes provision upon the remaining ground of mistake, it must be made to appear that the minds of the parties met upon the terms of the bargain they intended to

make. but because of mistake the writing fails to express that intention. Gould v. Nolen, 51 S. D. 472, 214 N. W. 853; § 504 Restatement, Contracts. This remedy is not invoked by a showing that the agreement between the parties resulted from a mutual mistake. Hughes v. Payne, 27 S. D. 214 130 N. W. 81; Russell v. Shell Petroleum Corporation, 10 Cir., 66 F.2d 864; McCay v. Jenkins, 244 Ala. 650, 15 So.2d 409, 149 A. L. R. 746. Elsewhere it has been written: "* * * if, because of mistake as to an antecedent or existing situation, the parties make a written instrument which they might not have made, except for the mistake, the court cannot reform the writing into one which it thinks they would have made, but in fact never agreed to." Vol. 5, Williston, Contracts, Rev. Ed., § 1549.

We do not understand either of the parties to this litigation to question these controlling principles. Whether the evidence establishes a meeting of the minds of the parties which differs from the intention manifested by the written contract is the question upon which they separate. The purchaser asserts, "The identity of the property bargained and sold was clearly established; as to that there was no mistake. The mistake occurred when the defendant prepared the contract and described the property as lot 7." It is the position of the vendor that because of a mutual misapprehension as to the location of the house, the parties agreed upon the purchase and sale of Lot 7; they expressed their agreement in their written contract; and their minds never met on any other or different bargain. In our opinion the position of the vendor and the quoted finding of the court and its judgment are supported by the evidence.

It is certain that the parties intended to contract for the purchase and sale of the house and a surrounding plot of ground. The house was identified. Had the parties identified a particular plot of ground which they later misdescribed in the contract as Lot 7? The purchaser sought to establish an identification of such a plot by his testimony that the broker had fixed the west boundary of Lot 7 as approximately 15 feet west of the house. However, that testimony is not available to him here, because his witness Ericson denied that they had discussed boundaries and the

trial court found that no attempt had been made to point out or fix the line between Lots 7 and 8. During the trial the purchaser abandoned his claim that the plot had been identified as including Lot 7 and the east 22 feet of Lot 8, and has since contended that the land upon which the minds had met was Lot 7 and the east 6.7 feet of Lot 7. We understand the purchaser's reasoning to be that the minds of the parties having fixed upon the house, their minds must have met at least upon a plot with a west boundary along an extension of the west line of the house. The fact is that the parties did not contract with reference to a piece of ground they had pointed out and identified in any manner. The vendor thought he was selling his house and a city lot for $3,500. He had not made up his mind to sell his house, Lot 7, and a fraction of Lot 8 for $3,500. On the other hand, the purchaser thought he was dealing with a plot which was later found to embrace the east 22 feet of Lot 8 as well as Lot 7. He was willing to pay $3,500 for the house and that particular plot of ground. He had never made up his mind to pay that price for a house and a lot which provided no yard along the west side thereof. The parties unquestionably had reached no definite and certain antecedent understanding with reference to the west boundary of the plot of ground involved in their proposed contract. In our opinion the evidence fails to establish that the words Lot 7, Block 3, were employed in the contract through the mistaken belief that it described a particular piece of ground the parties had agreed upon as the subject of their bargain. It does establish, we think, that those words were inserted in the written contract because, in arriving at the agreement manifested by their contract, both parties labored under the misapprehension that the house they intended to buy and sell was located within the boundaries of Lot 7.

Because the evidence fails to establish that the parties had arrived at an understanding which differed from the intention manifested by their contract, the court did not err in refusing the prayer for reformation.

The judgment of the trial court is affirmed.

All the Judges concur.